**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FRONTLINE TECHNOLOGIES GROUP LLC *doing business as* FRONTLINE EDUCATION, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> JOANNE PICONE-ZOCCHIA, an individual, and SOAR LEADERSHIP LLC, a New York limited liability company, <br><br> Defendants. | Case No. 25-5177 <br><br> **COMPLAINT FOR:** <br><br> **(1) DECLARATORY RELIEF OF CANCELLATION OF COPYRIGHTS** <br> **(2) DECLARATORY RELIEF OF NON-INFRINGEMENT** <br> **(3) ESTOPPEL** <br><br> **DEMAND FOR JURY TRIAL** |

**NATURE OF THE ACTION**

1.    This is an action for declaratory relief seeking cancellation of copyrights, non-infringement and equitable estoppel brought by an educational platform provider, Plaintiff Frontline Technologies Group LLC, *doing business as* Frontline Education ("Frontline"), against an asserted copyright owner of two educational rubrics, Defendant Joanne Picone-Zocchia ("Picone-Zocchia"). Additionally, Frontline seeks the same relief against SOAR Leadership LLC ("SOAR"), who purports to have an interest in the alleged copyrights based upon correspondence mentioned herein. Picone-Zocchia is the President of SOAR.

2.    Frontline provides a software solutions platform that school districts use to manage their operations. Through Frontline's platform, school districts access learning guides, rubrics, lesson plans, performance metrics and other materials helpful throughout the school year.

3.    Certain materials, such as rubrics, are routinely provided by their owners to Frontline for inclusion in Frontline's platform so that school districts (as the end users), in turn, can access, use and implement the materials in school operations.

165582.00002/155383340v.7

4.    Picone-Zocchia – either individually or through her predecessors in interest – made two of her copyrighted performance rubrics[1] (the "Rubrics") available to Frontline for inclusion on the Frontline platform. Critically, since January 2017, when the License Agreement mentioned herein was terminated, Picone-Zocchia and SOAR understood that Frontline would not manage the use of the licenses for the Rubrics, including collecting fees for use of the Rubrics by school districts. As is more fully set forth herein, it was Picone-Zocchia and SOAR's sole responsibility to both issue any licenses required from school districts and collect any licensing fees.

5.    Despite the well understood arrangement, Picone-Zocchia and SOAR now claim that Frontline improperly allowed school districts to access the Rubrics after the limited term of the licenses expired and further claims that, in doing so, Frontline infringed copyrights in those works, even though Picone-Zocchia, SOAR and its predecessors never advised Frontline that the licenses had expired for non-payment.

6.    Even though Picone-Zocchia and SOAR make the Rubrics widely available for free[2], Picone-Zocchia and SOAR take the untenable and irresponsible position that Frontline should have actively policed these licenses with each school district yearly to confirm the school districts paid annual fees to maintain current licenses to continue accessing the Rubrics. Frontline, however, had no contractual or other legal responsibility to collect such fees. Simply put, Frontline had no obligation to police these copyrights.

---

[1] A rubric is an assessment tool that provides a framework for evaluating a piece of work or a performance by listing criteria (the specific components of the assignment), values (such as "excellent," "good," "fair"), and detailed descriptors for what constitutes each performance level. By clearly defining expectations, rubrics offer individuals guidance on how to succeed and provide evaluators with a consistent, objective methods for grading and feedback.

[2] Picone-Zocchia has made the Rubrics available for free on the New York State Department of Education website. New York State Dept. of Ed., available at https://www.nysed.gov/sites/default/files/programs/educator-quality/mppr_rubric.pdf (last accessed Aug. 28, 2025).

7.    In a thinly veiled attempt to make up for failing to monitor the expiration of licenses, Picone-Zocchia and SOAR issued a cease-and-desist letter to Frontline on December 19, 2023, in which Defendants alleged that Frontline was committing copyright infringement by allowing school districts to continue accessing the Rubrics on its platform for users whose licenses apparently expired.

8.    Although Frontline flatly rejected this contention, shortly after the issuance of the cease and desist letter, counsel for SOAR and Picone-Zocchia and counsel for Frontline agreed to terms to settle the parties' dispute wherein Frontline would provide a list of school districts accessing the Rubrics on its platform to SOAR and Picone-Zocchia on an annual basis, and SOAR and Picone-Zocchia would then be responsible for securing any additional licenses and charging for any license fees directly with each school district. SOAR and Picone-Zocchia would also be responsible for notifying Frontline of any non-complying school districts whose access to the Rubrics needed to be terminated.[3]

9.    Counsel for SOAR and Picone-Zocchia even recognized that the responsibility for securing and monitoring the licenses each year was on them, not Frontline. Counsel wrote: "At the end of the day, this is our problem not yours…." (**Ex. A,** Jan. 24, 2024 Email Correspondence Between Counsel for Defendants and Counsel for Frontline.)

10.   In the months that followed submission of the settlement agreement by Frontline's counsel, SOAR and Picone-Zocchia's lawyers literally "went dark," refusing to communicate with Frontline's counsel and sign the settlement agreement. Then, a series of new lawyers surfaced for SOAR and Picone-Zocchia sequentially who feigned knowledge of the earlier settlement agreement, expressed a desire to continue settlement discussions, but ultimately

---

[3] There were no financial terms to settlement because Frontline does not receive fees for the Rubrics and has no obligation to police Defendants' licenses with the school districts to access the Rubrics every year.

165582.00002/155383340v.7

never consummated a settlement agreement. Finally, yet another law firm surfaced for SOAR and Picone-Zocchia who ignored the entire history of settlement discussions, demanded a substantial cash payment and threatened litigation. Exasperated by this perplexing and disingenuous history of settlement negotiations, Frontline elected to pursue the instant lawsuit, seeking relief from the Court to end this controversy once and for all.

11. Ultimately, this dispute involves a copyright owner who was dilatory and failed to implement a robust licensing program for her works and now resorts to baseless threats to extract a large payout.

12. Frontline seeks relief from this Court in the form of a declaration that Defendants' copyrights are not subject to protection and that Frontline is not infringing the copyrighted works. Frontline also requests that the Court find Defendants acquiesced to Frontline making the Rubrics available to school districts on its platform without any liability for several years, and that Defendants should be estopped from claiming copyright infringement at this late date.

## THE PARTIES

13. Plaintiff Frontline is a Delaware limited liability company headquartered at 550 E. Swedesford Road, Suite 360, Wayne, Pennsylvania 19087.

14. Defendant Picone-Zocchia is an individual who resides in Suffolk County, New York. Picone-Zocchia has owned the Rubrics since September 30, 2022, after acquiring them by assignment from the original co-owners – Learner-Centered Initiatives, Ltd. ("LCI") and Communities for Learning: Leading Lasting Change ("CFL") (collectively, the "predecessors-in-interest").

15. Defendant SOAR is a New York limited liability company with its principal place of business located at 200 Allwood Avenue, Central Islip, New York, 11722. SOAR is a

165582.00002/155383340v.7

consulting company that provides leadership development and evaluation products and services. As mentioned, Picone-Zocchia is the President of SOAR.

## JURISDICTION AND VENUE

16.  This is a civil action seeking declaratory and injunctive relief under the Copyright Act, 17 U.S.C. § 101 *et seq.*

17.  This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

18.  This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) in that the New York state law claim arises directly from the common nucleus of operative facts set forth in the claim arising in federal question jurisdiction.

19.  The Court is empowered to issue a declaratory judgment and further necessary or proper relief pursuant to 28 U.S.C. §§ 2201 and 2202.

20.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (c)(1) and 1400(a) both because Picone-Zocchia and SOAR are located, reside and may be found in this District.

## FACTUAL BACKGROUND

### A.  Frontline Education

21.  Frontline's mission is to partner with school districts and provide them with innovative technology and best practices to empower schools in their pursuit of excellence in education. Frontline is a software solutions platform that school districts use to manage their operations. Through Frontline's platform, school districts access learning guides, rubrics, lesson plans, performance metrics and other materials helpful for the school year.

165582.00002/155383340v.7

22. Frontline has offered access to its platform to school districts since 1998. In providing these platform services and software solutions for schools, Frontline envisions "a connected future for school administration that enables every leader, teacher and student to thrive." *See* Frontline Education, available at https://www.frontlineeducation.com/insights/partner-with-frontline/ (last accessed Aug. 28, 2025).

23. On or around January 4, 2016, Frontline acquired Teachscape, Inc. ("Teachscape"). Teachscape was a San Francisco-based company that provided K-12 professional development tools, including online courses, data collection tools and teacher evaluation systems, to improve teacher effectiveness and student achievement. Teachscape's products and services were fully integrated into Frontline and its platform.

**B.  Issuance of Copyrights for the Rubrics Initially to LCI**

24. There are two copyrights at issue in this case: (i) the Multidimensional Principal Performance Rubric (U.S. Copyright Reg. No. TX0007834005) ("MPPR") and (ii) the Multidimensional Leadership Performance Rubric (U.S. Copyright Reg. No. TX0007842201) ("MLPR") (collectively, the "Rubrics").

25. In July 2013, the United States Copyright Office issued copyright registration certificates for the Rubrics. Two entities – LCI and CFL – were listed as the original co-claimants and co-authors of the Rubrics.

26. By way of background, LCI is an educational consulting company that works with educators on teaching methods to be implemented in the classroom.

27. From at least 1997 to 2020, Picone-Zocchia served as the Vice President of LCI.

28. Additionally, from at least 2005 to 2020, Picone-Zocchia served as the Vice President of CFL.

29. In her capacity as an officer of LCI, Picone-Zocchia knew of and was familiar with this arrangement and intention for Teachscape to make the Rubrics accessible to school districts.

## C. Licensing & Delivery of the Rubrics

### i. Licensing of the MPPR Rubric to Teachscape

30. With respect to the MPPR, Teachscape entered into a Development and Non-Exclusive License Agreement with LCI effective as of August 9, 2012 (the "License Agreement"), in which LCI granted Teachscape a non-exclusive license to the make the MPPR available on its platform to school districts. (**Ex. B,** License Agreement.) The License Agreement did not mention or reference the MLPR. (*Id.*)

### ii. Licensing of the MPLR Rubric to Teachscape

31. With respect to the MLPR, upon information and belief, LCI delivered the MLPR to Teachscape with the intention that Teachscape would also make the MLPR available on its platform to school districts.

32. Upon information and belief, from 2013 through 2016, Teachscape made the MLPR available to school districts on its platform.

33. There were no written agreements governing the licensing or use of the MLPR between LCI and/or CFL on the one hand, and Teachscape on the other hand. Rather, LCI delivered Teachscape the MLPR with no terms or conditions, other than the general request that Teachscape make it available to school districts.

165582.00002/155383340v.7

### iii.  Delivery of the Rubrics to Teachscape

34.  Upon information and belief, in or around 2012-2013, LCI [4] requested that Teachscape upload copies of the Rubrics onto the Teachscape platform and permit school districts to access and use those Rubrics throughout the school year.

35.  Upon information and belief, LCI delivered to Teachscape copies of the Rubrics to be uploaded to the Teachscape platform, so that school districts (as the end users) could access and use those Rubrics.

36.  Upon information and belief, LCI intended for school districts to have access and to use the Rubrics that were available on the Teachscape platform.

37.  Teachscape, at its own cost, uploaded or otherwise programmed the Rubrics into their respective platforms.

38.  Until the assignment to Frontline mentioned below, Teachscape granted access to the Rubrics to school districts only after Teachscape collected licensing fees from the districts. Even though the MLPR was not part of the License Agreement, Teachscape charged the same license fees for both for the MPPR and MLPR for end users. The licensing fees that Teachscape charged were nominal, typically yielding sixty dollars ($60 USD) per license, from which forty-eight dollars ($48 USD) was remitted to Teachscape.

### iv.  Assignment of the License Agreement for the MPPR Rubric to Frontline.

39.  The License Agreement – and the right to distribute the MPPR – was subsequently assigned to Frontline as the successor-in-interest to Teachscape when Frontline acquired Teachscape on January 4, 2016. (**Ex. B,** License Agreement at ¶ 4.1.)

---

[4] As a co-owner of the Rubrics, LCI had the right to unilaterally grant non-exclusive licenses to the copyrighted works (i.e., without CFL's involvement).

40. As a result of the acquisition, Teachscape's products, services and licenses were fully integrated into Frontline and its platform.

41. Frontline continued to follow the same procedures for granting access to the Rubrics after it acquired Teachscape.

42. Upon information and belief, as Vice President of LCI at that time, Picone-Zocchia was aware of the procedures followed by Frontline for providing school districts access to the Rubrics.

### D. Termination of License Agreement & Course of Performance Post-Termination

43. On January 11, 2017, approximately one year after Frontline was assigned the License Agreement, the parties elected to terminate the License Agreement. The letter agreement signed by both Frontline and LCI explicitly stated as follows: "[i]n the interest of reducing confusion as to the cost of utilizing the LCI Rubric," Frontline and LCI, who was then-owner of the copyrights, terminated the License Agreement with respect to the MPPR. (**Ex. C,** Termination Letter.) Significantly, there was no alleged termination of any license for the MLPR.

44. In connection with the termination, Picone-Zocchia sent a letter to the school districts, which stated in relevant part:

> Frontline's purchase of Teachscape has resulted in some changes in how you access and use the Multidimensional Principal Performance Rubric (MPPR) and the Multidimensional Leadership Performance Rubric (MLPR) evaluation tools.

> The good news is that you can still use the MPPR and MLPR electronically. However, instead of purchasing access to the rubric(s) from Frontline (as you used to from Teachscape), **you now need to contact Learner-Centered Initiatives to license an unlocked, uploadable version of the tool and permission to incorporate it into your data management system**.…

> To purchase your MPPR and MLPR licenses, or for more information about this or any of the other MPPR/MLPR-related products or services that we have available, please contact

165582.00002/155383340v.7

LCI's Contracts Manager, Marianne Mueller, directly….

Sincerely,

Joanne Picone-Zocchia
Vice President
Learner Centered Initiatives, Ltd.

(**Ex. D,** LCI Letter to Existing Customers dated Jan. 2017 (emphasis added).)

45.    Upon information and belief, Picone-Zocchia sent this letter to school districts that were existing customers so that they could contact LCI directly to purchase and obtain licenses to the Rubrics.

46.    Importantly, as set forth in the foregoing letter, LCI had assumed the role of distributing unlocked, uploadable versions of the Rubrics to school districts.

47.    Additionally, in or around March 2017, Frontline provided the following communication to school districts that were existing users of the Rubrics through its platform:

Frontline has been notified by Learner Centered Initiatives, Ltd. (LCI) that going forward **LCI will distribute and sell** the Multidimensional Principal Performance Rubric (MPPR) and the Multidimensional Leadership Performance Rubric (MLPR) evaluation tools directly and not through Frontline. Upon expiration of your current MPPR/MLPR licenses **and to purchase continued licenses**, or for more information about this or any of the other MPPR/MLPR-related products or services available from LCI, you may contact LCI's Contracts Manager, Marianne Mueller, directly….

(**Ex. E,** Frontline Feb. 2017 Email Correspondence Providing Notice to Customers (emphasis added).)

48.    Frontline's notice was sent to the school districts notifying them that licenses would need to be secured directly from LCI moving forward. Thus, following termination of the License Agreement, Frontline had no obligation to collect licensing fees from end users of the Rubrics.

49.    Following termination of the License Agreement, the parties' general practice in making Rubrics available was as follows: (i) LCI (and later Defendants) was to secure licenses

and obtain fees directly from the school districts; (ii) the school districts would request access to the Rubrics on Frontline's platform; (iii) Frontline would confirm that the school districts had a license with LCI (or later Defendants) to use the Rubrics during implementation of a school district's platform; (iv) Frontline would allow access to the Rubrics for that particular school district; and (v) Frontline would neither seek nor receive any fees or financial benefit from LCI, Defendants or the school districts in connection with making the Rubrics available on its platform. This course of performance started in or around January 2017 and continues to this day.

50. This course of performance demonstrated how Frontline relied upon an implied license wherein LCI and Defendants permitted Frontline to allow qualifying school districts to access and use the Rubrics on the Frontline platform.

51. By requesting confirmation of licensing from each school district, Frontline's practice was to exercise reasonable caution and care to confirm that each school district had a license to access and use these works.

52. In other words, when a school district sought to access the Rubrics through Frontline's platform for the first time, Frontline's practice was to request that the school district provide documentation or information indicating that it had properly licensed the Rubrics from Defendants.

53. Since the termination of the License Agreement, Frontline has not charged any school district for access to the Rubrics. Instead, licensing, charges and billing were handled by LCI (and later, by Defendants).

54. Additionally, after Frontline granted access to the Rubrics on its platform, it allowed access until it was advised that the licenses were no longer in effect. Put another way,

-11-

Frontline assumed that LCI would collect the licensing fees associated with use of the Rubrics and notify Frontline if the licenses expired, since LCI had taken over this responsibility when the License Agreement was terminated.

### E.  Assignment of Rubrics to Picone-Zocchia

55.  On September 30, 2022, LCI and CFL assigned the Rubrics to Picone-Zocchia (the "Assignment"). (**Ex. F,** Assignment.)

56.  The Assignment states in relevant part:  "Assignors do hereby transfer, assign, sell, convey, set over, and deliver to Assignee all of Assignors' rights in and to the following works (the 'Transferred Interest'): a. [MPPR] b. [MLPR]….The Transferred Interest consists of all rights, claims, and other interests of Assignors in and to the Transferred Interest of any type whatsoever." (*Id.* at ¶ 1.)

57.  Importantly, the Assignment does not specifically or explicitly assign Picone-Zocchia the right to sue for past infringement of the Rubrics. (*Id.*)

### F.  Picone-Zocchia's Acquiescence & Frontline's Implied License

58.  On or around September 25, 2023, with reference to a New Jersey school district, Picone-Zocchia wrote to Frontline detailing the arrangement that the parties had agreed on for permitted licensing, access and use of the Rubrics through the Frontline platform – with an additional caveat. Specifically, she wrote:

> I received a license request from a NJ superintendent who is starting with the MPPR this year through your company. He said he was told by the Frontline rep that he needed permission in order to use it through Frontline. That is precisely what should be happening – but it needs to happen every year, with every new or continuing Frontline client using the MPPR/MLPR….

(**Ex. G**, September 25, 2023 Email from Picone-Zocchia to Frontline.)

165582.00002/155383340v.7

59. Picone-Zocchia acknowledged that Frontline was requiring documentation showing that each school district had obtained licenses from Picone-Zocchia before allowing the school districts to access and use the Rubrics through the Frontline platform. (*Id.*) Frontline, however, had no obligation to monitor and police all school district licenses with Picone-Zocchia every year thereafter, as she now claimed.

60. Thereafter, on multiple occasions, Frontline's counsel advised Picone-Zocchia's counsel that Frontline had no legal obligation to monitor the licenses, would not do so and would remove access to the Rubrics unless an agreement was reached with Picone-Zocchia which memorialized Frontline's position.

## G. Defendants' Cease-and-Desist Letter & Ensuing Settlement Discussions

61. On December 19, 2023, Joanne Picone-Zocchia and SOAR, through counsel, sent a cease-and-desist letter to Frontline, alleging that Frontline infringed the copyrights to the Rubrics. According to Defendants, Frontline should have been actively monitoring the status of the licenses the school districts obtained each year to ensure that the licenses were current, and failure to do so resulted in unauthorized use and infringement.

62. Frontline rejected this contention. Counsel for Frontline and counsel for Defendants reached a settlement in or around January 2024 in which Frontline would provide Defendants with a list of school districts accessing the Rubrics on its platform on an annual basis, and Defendants would then be responsible for securing any additional licenses and charging for any license fees directly with each school district. Defendants would also be responsible for notifying Frontline of any non-complying school districts whose access to the Rubrics needed to be terminated. There were no financial terms to settlement because Frontline does not receive

165582.00002/155383340v.7

fees for the Rubrics and has no obligation to police Defendants' licenses with the school districts to access the Rubrics every year.

63. Counsel for Defendants recognized that the responsibility for securing and monitoring the licenses each year was on Defendants, not Frontline. Counsel wrote: "At the end of the day, this is our problem not yours…." (**Ex. A,** Jan. 24, 2024 Email Correspondence Between Counsel for Defendants and Counsel for Frontline.)

64. On January 24, 2024, counsel for Frontline sent to counsel for Defendants a settlement agreement to be executed by the parties (the "Settlement Agreement") which memorialized the agreed-upon terms. (*Id.*)

65. For reasons presently unknown to Frontline, Picone-Zocchia and SOAR's counsel refused to communicate with Frontline's counsel and execute the Settlement Agreement.

66. It was not until March 19, 2024, after much chasing, that counsel informed Frontline that he was no longer representing Defendants, and that communications should be directed to new counsel moving forward. (**Ex. H,** Mar. 19, 2024 – Apr. 5, 2024 Email Correspondence Between Counsel for Defendants and Counsel for Frontline.)

67. On April 5, 2024, Frontline was informed that Defendants were hiring yet another counsel for representation in this matter. (*Id.*)

68. From April 2024 to today, Frontline has attempted to work with no less than four different attorney teams who have claimed to represent Defendants in resolving this dispute.

69. Frontline has repeatedly expressed to Defendants that: (i) it has not engaged in copyright infringement; (ii) it has acted in view of Defendants' full knowledge of Frontline's actions; (iii) its practice is to request that school districts confirm that they have obtained licenses with Defendants to use the Rubrics before being given access for the first time; (iv) it

-14-

has not financially benefitted from the Rubrics (Frontline does not recoup any fees associated with the Rubrics, all licensing fees are paid directly from the school districts to Defendants); (v) it is Defendants' responsibility – not Frontline's – to monitor and police its licenses; and (vi) it has attempted to amicably resolve this dispute with Defendants to no avail.

70. As recently as April 28, 2025, attorneys claiming to represent Defendants sent Frontline a cease-and-desist letter reiterating Defendants' baseless copyright infringement allegations – and demanding financial compensation of more than one million dollars ($1,000,000 USD). (**Ex. I,** Apr. 28, 2025 Letter from Watson & Young.) But even those attorneys have now been replaced by a combination of new counsel and prior counsel, further confounding Frontline's continued good-faith efforts to end this controversy.

71. In light of the earlier settlement terms, and the school districts who rely upon the Rubrics, Frontline has maintained the status quo and has not removed the Rubrics from its platform, as Frontline continues to offer ongoing support to Defendants to manage their licensing program, should they desire to.

72. Due to Defendants' actions, Frontline is left with no choice but to bring this suit seeking from the Court a declaration of non-infringement and equitable estoppel to bring this dispute to a final resolution.

## FIRST CLAIM FOR RELIEF

### (Declaratory Relief for Cancellation of

### U.S. Copyright Reg. Nos. TX0007834005 and TX0007842201)

73. Frontline hereby incorporates the allegations set forth in paragraphs 1 through 72 above, as through fully set forth herein.

-15-

165582.00002/155383340v.7

74. Defendants' two copyrights at issue in this dispute – (i) the Multidimensional Principal Performance Rubric (U.S. Copyright Reg. No. TX0007834005) ("MPPR") and (ii) the Multidimensional Leadership Performance Rubric (U.S. Copyright Reg. No. TX0007842201) ("MLPR") – are subject to cancellation based on the merger doctrine.

75. The merger doctrine provides that an expression is not protected under U.S. copyright law in those instances where there is only one way – or so few ways – of expressing an idea that protection of the expression would effectively (and improperly) accord protection to the idea itself.

76. The MPPR provides a guide for evaluating principals.

77. The MLPR provides a guide for evaluating school administrators.

78. The Rubrics embody the idea of evaluating principals and school administrators, respectively, through basic metrics and characterizations of performance.

79. With so few ways of measuring the performance of principals and school administrators, the MPPR and MLPR are prime examples of expressions that are inseparable from the underlying ideas, functions or methods of operation. In particular, the MPPR is a basic guide for evaluating principals, and the MLPR is a basic guide for evaluating school administrators.

80. Indeed, the MPPR and MLPR contain basic evaluation matrixes and terminology that is approved by the New York Department of Education and are found routinely throughout other educators' rubrics.

81. In this case, the ideas and their respective expressions are so intertwined that protecting the expressions would effectively grant Defendants a monopoly over the ideas themselves.

165582.00002/155383340v.7

82.    For example, the scale of "ineffective, developing, effective and highly effective" in the MPPR is dictated by functional necessity and industry standards, leaving no room for alternative expression.

83.    That the Rubrics are also offered for free is further indication that the expressions are not proprietary.

84.    Therefore, the MPPR and MLPR are not protectable expressions under U.S. copyright law.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief for Non-Infringement Due to Complete Defenses)

85.    Frontline hereby incorporates the allegations set forth in paragraphs 1 through 84 above, as though fully set forth herein.

86.    A real case and controversy exists relating to the rights, duties and obligations of Frontline and Defendants with respect to the Rubrics. 28 U.S.C. § 2201 and 2022.

87.    A claim of direct copyright infringement requires proof of: (1) ownership of a valid copyright and (2) infringement of the copyright by another. *Abdin v. CBS Broad. Inc.,* 971 F.3d 57, 66 (2d Cir. 2020) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

88.    A written or implied non-exclusive license to a copyrighted work is a complete defense to copyright infringement. *Yamashita v. Scholastic Inc.,* 936 F.3d 98, 104 (2d Cir. 2019); *Psihoyos v. Pearson Educ., Inc.,* 855 F. Supp. 2d 103, 120 (S.D.N.Y. 2012). A valid license to use a copyrighted work "immunizes [a] licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor." *Davis v. Blige*, 505 F.3d 90, 100 (2d Cir. 2007); *see also Spinelli v. Nat'l Football League,* 903 F.3d

-17-

185, 197 (2d Cir. 2018). An implied license exists where a copyright owner requests, delivers and intends to allow another's copying and distribution of the copyrighted work. *Psihoyos,* 855 F. Supp. 2d at 120; *see also SHL Imaging, Inc. v. Artisan House, Inc.,* 117 F. Supp. 2d 301, 317 (S.D.N.Y.2000) ("An implied [non-exclusive] license can only exist where an author creates a copyrighted work with knowledge and intent that the work would be used by another for a specific purpose.")).

89. A claim of contributory copyright infringement (secondary liability) occurs when a party, with knowledge of infringing activity, materially contributes to the infringing activity of another. *Spinelli,* 903 F.3d at 197 (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)).

90. A claim of vicarious copyright infringement (secondary liability) requires (i) a party to have the right and ability to supervise or control the infringing activity and (ii) the party to receive a direct financial benefit derived from the infringement. *Rams v. Def Jam Recordings, Inc.,* 202 F. Supp. 3d 376, 385 (S.D.N.Y. 2016).

91. Without a showing of a direct copyright infringement, secondary liability cannot be maintained. *Spinelli,* 903 F.3d at 197 (citing cases).

92. Defendants are now claiming that Frontline has infringed its copyrights in the Rubrics by allowing school districts to access and use the Rubrics through the Frontline platform.

93. Frontline repeatedly informed Defendants that there is no merit to its allegations of copyright infringement.

94. There are several significant – and complete – defenses to Defendants' allegations of copyright infringement.

-18-

165582.00002/155383340v.7

### a. Defendants Have No Right to Sue for Past Infringement

95. Defendants alleged that Frontline's purported copyright infringement began in January 2017, when the License Agreement for the MPPR was terminated. *See* **Ex. I,** Apr. 28, 2025 Letter from Watson & Young ("Frontline exercised the termination clause of its licensing agreement with SOAR's predecessor, LCI, on January 11, 2017. Despite this termination, your company has continued distributing and allowing access to the MPPR and MLPR rubrics through its platform….this continued use constitutes willful copyright infringement under 17 U.S.C. § 501.").

96. But Defendants did not secure the right to sue for any past copyright infringement that may have occurred prior to the Assignment of the Rubrics from LCI and CFL to Picone-Zocchia on September 30, 2022.

97. The Assignment does not contain specific or explicit language transferring the right to sue for past infringement.

98. Under copyright law, accrued causes of action for copyright infringement do not automatically transfer to the assignee unless the assignment explicitly includes them. *See* 3 Nimmer on Copyright § 12.02 (2025) (citing 17 U.S.C. § 501(b)). Courts have consistently held that the right to sue for past infringements must be expressly stated in the assignment agreement. *See id.*; *see also ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 944 F.2d 971 (2d Cir. 1991) (noting that the general presumption is that a copyright assignment does not convey the right to sue for prior causes of action unless explicitly stated. Instead, courts have generally required clear and express language to overcome this presumption).

99. Since the Assignment does not contain explicit language conveying the right to sue for past infringement, Defendants are prohibited from bringing any claim of copyright infringement that may have occurred before the Assignment on September 30, 2022.

-19-

165582.00002/155383340v.7

**b.  Frontline's Implied License Is a Complete Defense to Copyright Infringement**

100.  Frontline had an implied license from Defendants (and Defendants predecessors-in-interest) to make the Rubrics available on its platform and operated under this relationship for several years (from at least 2017 through 2023).

101.  Defendants' predecessor-in-interest, LCI, requested that Frontline's predecessor, Teachscape, make the Rubrics available to school districts on its platform.

102.  LCI delivered the Rubrics to Teachscape with the intention that Teachscape would make them available to school districts on its platform.

103.  After Teachscape was acquired by Frontline in 2016, the Rubrics were delivered to Frontline with the intention that Frontline would make them available to school districts through its platform for LCI's (and later Defendants') benefit.

104.  Since 2017, the parties have continuously operated under the following implied license arrangement: (i) LCI (and later Defendants) would secure licenses and recoup fees directly from the school districts; (ii) the school districts would request access to the Rubrics on Frontline's platform; (iii) Frontline's practice was to confirm in the first instance that the school districts had a license with LCI (or later Defendants) to use the Rubrics (requiring each school district to provide documentation and proof of the license); (iv) then Frontline would allow access to the Rubrics for that particular school district; (v) Frontline did not receive any fees or financial benefit from LCI, Defendants or the school districts in connection with making the Rubrics available on its platform.

105.  This course of performance demonstrated how Frontline relied upon an implied license wherein LCI and Defendants permitted Frontline to allow school districts to access and use the Rubrics on the Frontline platform.

165582.00002/155383340v.7

106. LCI and Defendants delivered the Rubrics to Frontline so that they could be uploaded to the Frontline platform and could be made available to the school districts.

107. Frontline's practice was to confirm there was a license between the school districts and Defendants (or Defendants' predecessors-in-interest) before allowing access to the Rubrics.

108. Frontline was under no obligation to actively monitor and police the status of each school district's license with Defendants on an annual basis. That responsibility lies with Defendants.

109. There was no expectation that Frontline would actively monitor and police Defendants' licenses with the school districts. This expectation was first expressed to Frontline on or around September 25, 2023, when Picone-Zocchia wrote to Frontline detailing the arrangement that the parties had agreed on for permitted licensing, access and use of the Rubrics through the Frontline platform – with an additional caveat. In particular, she wrote:

> I received a license request from a NJ superintendent who is starting with the MPPR this year through your company. He said he was told by the Frontline rep that he needed permission in order to use it through Frontline. That is precisely what should be happening – but it needs to happen every year, with every new or continuing Frontline client using the MPPR/MLPR….

(**Ex. G**, Sept. 25, 2023 Email from Picone-Zocchia to Frontline.)

110. Frontline's implied license arrangement is a complete defense to any claim of copyright infringement.

### c. Frontline's Lack of Knowledge Is a Complete Defense to Contributory Copyright Infringement

111. A claim of contributory copyright infringement (secondary liability) occurs when a party, with knowledge of infringing activity, materially contributes to the infringing activity of another. *Spinelli,* 903 F.3d at 197 (citing *Metro-Goldwyn-Mayer Studios Inc.*, 545 U.S. at 930).

-21-

112.  Knowledge is a key element of a contributory infringement claim.

113.  Frontline had no knowledge that the school districts were allegedly accessing and using the Rubrics through its platform without authorization from Defendants.

114.  Frontline's practice was to ask school districts to confirm they had a license with Defendants before allowing the school district access to the Rubrics through its platform. By taking this step, Frontline reasonably had knowledge that the school districts were authorized to use the Rubrics and therefore felt comfortable allowing access to the Rubrics through its platform. Defendants never alerted Frontline to any expirations or issues with school districts' licenses to the Rubrics. Frontline, consequently, had no knowledge that the school districts' licenses were not renewed with Defendants.

### d.  Frontline's Absence of Financial Benefit Is a Complete Defense to Vicarious Copyright Infringement

115.  A claim of vicarious copyright infringement (secondary liability) requires: (i) a party to have the right and ability to supervise or control the infringing activity and (ii) the party to receive a direct financial benefit derived from the infringement. *Rams,* 202 F. Supp. 3d at 385.

116.  A copyright owner must show that the purported infringer received a direct financial benefit derived from the infringement to succeed on a vicarious copyright infringement claim. *Id.*

117.  Frontline did not receive any financial benefit from the Rubrics.

118.  Frontline does not recoup any fees associated with the Rubrics.

119.  All licensing fees for the Rubrics are paid directly from the school districts to Defendants.

165582.00002/155383340v.7

120.  Defendants designed, acknowledged and approved of this payment structure. (**Ex. D,** LCI Letter to Existing Customers dated Jan. 2017.)

121.  In her letter to school districts, Picone-Zocchia stated that: "The good news is that you can still use the MPPR and MLPR electronically. However, instead of purchasing access to the rubric(s) from Frontline (as you used to from Teachscape), you now need to contact Learner-Centered Initiatives to license an unlocked, uploadable version of the tool and permission to incorporate it into your data management system." (*Id.*)

122.  Therefore, any claim of vicarious copyright infringement lodged against Frontline is without merit.

### e.  Laches Bars Any Claim of Copyright Infringement

123.  Defendants have known or should have known of Frontline's allegedly infringing conduct since at least 2017.

124.  Despite this knowledge, Defendants failed to take any legal action or assert any claim of infringement for several years (i.e., from at least 2017 through 2023).

125.  During this six-year period, Frontline continued to allow school districts to access the Rubrics openly in reliance upon (i) the implied license arrangement between Defendants and Frontline, and (ii) Defendants' failure to raise any objection to the school districts' use of the Rubrics on the Frontline platform.

126.  Defendants' multi-year delay in asserting its rights is unreasonable and inexcusable.

127.  Frontline has suffered material prejudice as a result of Defendants' delay.

128.  Under the doctrine of laches**,** any purported claim of copyright infringement is barred because the delay has caused undue prejudice to Frontline.

-23-

165582.00002/155383340v.7

129. Frontline, therefore seeks a declaration that any copyright infringement claim alleged by Defendants is barred by the doctrine of laches.

**f.  A Declaration of Non-Infringement in Favor of Frontline Is Necessary**

130.  Based upon the foregoing facts, pursuant to 28 U.S.C. § 2201 and 2022, a case of actual and present controversy within the jurisdiction of this Court has arisen and now exists between Frontline and Defendants, concerning their respective rights, duties and obligations with respect to the Rubrics. Specifically, Frontline contends that it has not committed any kind of copyright infringement of the Rubrics, since, among other things:

a.  Defendants' Rubrics are not protectable under U.S. copyright law.

b.  Defendants have no right to sue for past infringement.

c.  Frontline had an implied license to make the Rubrics available to school districts on its platform.

d.  Frontline's practice was to confirm there was a license between each school district and Defendants (or Defendants' predecessors-in-interest) showing that the school district had authorization to use the Rubrics before allowing the school district to access the Rubrics on its platform.

e.  Frontline did not receive any direct financial benefit from the Rubrics. Frontline does not recoup any fees associated with the Rubrics, all licensing fees are paid directly from the school districts to Defendants.

f.  Defendants knew of, acknowledged and approved of this arrangement for years (i.e., from 2017 through 2023).

g.  It is Defendants' responsibility – not Frontline's – to monitor and police its licenses with the school districts.

131.  Frontline desires a judicial determination of its rights, duties and obligations, and a present declaration that it has not committed any kind of copyright infringement in allowing school districts that had previously secured authorization from Defendants (or Defendants' predecessors-in-interest) to access the Rubrics through its platform.

165582.00002/155383340v.7

132. In the absence of prompt and immediate declaratory relief, Frontline will continue to be damaged and to experience significant uncertainty with respect to Defendants' threats of liability.

133. Frontline, therefore, respectfully requests that the Court enter a declaration of non-infringement in favor of Frontline.

### THIRD CLAIM FOR RELIEF

### (Estoppel)

134. Frontline hereby incorporates the allegations set forth in paragraphs 1 through 133 above, as though fully set forth herein.

135. Estoppel is an equitable defense to copyright infringement. 4 Nimmer on Copyright § 13.07 (2025) (citing *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 948 (S.D.N.Y. 1997)).

136. In order to demonstrate equitable estoppel, an alleged infringer must show that: (i) the copyright owner had knowledge of the allegedly infringing acts; (ii) the copyright holder either intended that the alleged infringer rely on her acts or omissions or acted or failed to act in such a manner that the alleged infringer had a right to believe that it was intended to rely on the copyright holder's conduct; (iii) the alleged infringer was ignorant of the true facts; and (iv) the alleged infringer relied on the copyright owner's conduct to its detriment. *O'Neil v. Ratajkowski,* 563 F. Supp. 3d 112, 134 (S.D.N.Y. 2021).

137. Defendants had knowledge of the allegedly infringing acts as far back as January 2017.

138. Defendants acted in such a manner that Frontline had a right to believe that it was operating under an implied license in allowing school districts to access and use the Rubrics

165582.00002/155383340v.7

through its platform. Frontline's practice was to confirm with each school district that the district had obtained a license with Defendant (or Defendants' predecessors-in-interest) to access and use the Rubrics. Then Frontline would provide access to the Rubrics to those particular districts. Defendants never objected to this arrangement and never asked that Frontline seek any other verification of the licenses between the school districts and Defendants. Indeed, it was Defendants – not Frontline – who were responsible for obtaining licenses from the school districts.

139. Frontline was never under the impression that it was obligated to actively police Defendants' licenses with the school districts every year. Rather, it was Frontline's understanding that this responsibility lay with Defendants – not Frontline.

140. Frontline had a good faith belief that it was operating in accordance with the implied license to make the Rubrics available to school districts through its platform. *See Legislator 1357 Ltd. v. Metro-Goldwyn-Mayer, Inc.,* 452 F. Supp. 2d 382, 393 (S.D.N.Y. 2006) ("[r]epresentations by plaintiffs … and lengthy delay in filing this action, as well as defendants' good faith belief that plaintiffs viewed them as the owners of the film rights in the Work raise a genuine issue of disputed fact with respect to the defense of equitable estoppel.").

141. Frontline relied on Defendants' conduct for years to its detriment. Only recently have Defendants demanded more than one million dollars ($1,000,000 USD) for alleged copyright infringement stemming from years' of an agreed-upon course of performance and conduct by the parties.

142. Defendants should be estopped from raising any claims related to Frontline and the Rubrics based on years of amicable understanding and reliance upon the implied license arrangement that the parties had established.

-26-

143. "[I]f the facts show that there was nothing to indicate to defendants that they were unauthorized to use the copyrighted work, and if they reasonably relied on that state of affairs to their detriment, then the result is to defeat plaintiff's cause of action entirely, for the future as well as for past conduct." 4 Nimmer on Copyright § 13.07 (2025) (quoting *Keane Dealer Servs., Inc.*, 968 F. Supp. at 948).

144. Frontline has been harmed as it has reasonably relied on the parties' implied license arrangement and course of performance since January 2017.

145. As a result, Frontline requests that Defendants be estopped from raising any claims with respect to the Rubrics, any allegations of copyright infringement or its relationship with Frontline.

## PRAYER FOR RELIEF

**WHEREFORE**, Frontline respectfully requests that the Court enter judgment against Defendants, as follows:

A. An order cancelling U.S. Copyright Reg. Nos. TX0007834005 and TX0007842201;

B. A declaration that Frontline has not committed any copyright infringement with respect to the Rubrics;

C. An order that Defendants be equitably estopped from alleging any claims or copyright infringement or wrongdoing on the part of Frontline with respect to the Rubrics or its relationship with Defendants;

D. A permanent injunction enjoining and restraining Defendants, and its respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in

165582.00002/155383340v.7

concert with them or at their direction, and each of them, from claiming and past, current or future allegations of copyright infringement against Frontline with respect to the Rubrics and from alleging any claim of wrongdoing against Frontline with respect to the Rubrics;

E.    For such fees and costs (including reasonable attorney's fees) incurred herein as permitted by law; and

F.    For such other and further relief as this Court deems just and proper.

**BLANK ROME LLP**

Dated: September 15, 2025

By: */s/ Rachel L. Cohn*

James T. Smith (Pro Hac Vice to be filed)
jim.smith@blankrome.com
David M. Perry (Pro Hac Vice to be filed)
david.perry@blankrome.com
Jillian M. Taylor (Pro Hac Vice to be filed)
jillian.taylor@blankrome.com
Rachel L. Cohn
rachel.cohn@blankrome.com
**BLANK ROME LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 885-5000
Facsimile: (212) 885-5001

*Attorneys for Plaintiff*

165582.00002/155383340v.7

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of the claims alleged in this Complaint.

**BLANK ROME LLP**

Dated: September 15, 2025

By: */s/ Rachel L. Cohn*

James T. Smith (Pro Hac Vice to be filed)
jim.smith@blankrome.com
David M. Perry (Pro Hac Vice to be filed)
david.perry@blankrome.com
Jillian M. Taylor (Pro Hac Vice to be filed)
jillian.taylor@blankrome.com
Rachel L. Cohn
rachel.cohn@blankrome.com
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 885-5000
Facsimile: (212) 885-5001

165582.00002/155383340v.7